J-A20044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| ANGELA MARINUCCI, | : | |
| | : | |
| Appellant | : | No. 1758 WDA 2015 |

Appeal from the Judgment of Sentence July 1, 2015
in the Court of Common Pleas of Westmoreland County,
Criminal Division, No(s): CP-65-CR-0000850-2010

BEFORE: BOWES, STABILE and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED OCTOBER 17, 2016**

Angela Marinucci ("Marinucci") appeals the judgment of sentence imposed, upon re-sentencing, for her convictions of first-degree murder, second-degree murder, third-degree murder, kidnapping, conspiracy to commit homicide, and conspiracy to kidnap.[1] We affirm.

In its Opinion, the trial court set forth the gruesome factual history of this case, which we adopt for the purpose of this appeal. **See** Trial Court Opinion, 10/28/15, at 1-14.

The trial court sentenced Marinucci to life in prison without the possibility of parole. A panel of this Court affirmed her conviction, but remanded for re-sentencing based on **Miller v. Alabama**, 132 S. Ct. 2455

---

[1] **See** 18 Pa.C.S.A. §§ 2502(a), (b), (c); 2901(a)(3); 903(a)(1).

(2012);[2] ***Commonwealth v. Batts***, 66 A.3d 286 (Pa. 2013) (hereinafter

"***Batts I***");[3] ***Commonwealth v. Lofton***, 57 A.3d 1270 (Pa. Super. 2012);

and ***Commonwealth v. Knox***, 50 A.3d 732 (Pa. Super. 2012). ***See***

***Commonwealth v. Marinucci***, 83 A.3d 1073 (Pa. Super. 2013)

(unpublished memorandum). The Pennsylvania Supreme Court denied

Marinucci's Petition for allowance of appeal. ***See Commonwealth v.***

***Marinucci***, 86 A.3d 232 (Pa. 2014).

---

[2] In ***Miller***, the Court held that the Eighth Amendment to the United States Constitution forbids a sentencing scheme that *mandates* life in prison without the possibility of parole for juvenile offenders, and that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. ***See Miller***, 132 S. Ct. at 2474. While the Court did not prohibit the imposition of such a sentence, it ruled that the trial court must first consider certain age-related factors prior to imposing such a sentence. ***See id***. at 2468-69 (wherein the Court held that mandatory prison sentence of life without parole for a juvenile precludes consideration of the defendant's age (and its hallmark features-- among them, immaturity, impetuosity, and failure to appreciate risks and consequences), the defendant's family and home environment (which may be brutal or dysfunctional), the circumstances of the homicide offense (including the extent of the defendant's participation in the conduct and the way familial and peer pressures may have affected him), whether the defendant might have been charged and convicted of a lesser offense if not for incompetencies associated with youth (such as an inability to deal with police officers or prosecutors, or incapacity to assist his own attorneys)).

[3] In ***Batts I***, the Pennsylvania Supreme Court narrowly interpreted ***Miller*** as requiring only that there be judicial consideration of the appropriate age-related factors set forth in that decision prior to the imposition on a juvenile of a sentence of life imprisonment without the possibility of parole. ***See Batts I***, 66 A.3d at 296.

On July 1, 2015, upon remand, the trial court re-sentenced Marinucci to life in prison without the possibility of parole.[4] Marinucci thereafter filed a post-sentence Motion, which the trial court denied. This timely appeal followed.

On appeal, Marinucci raises the following issues for our review:

1  Whether the court below erred in imposing an illegal sentence, by imposing a life sentence without the possibility of parole[,] in contradiction to the clear mandate stated in [**Batts I**], that "it is our determination here that they are subject to a mandatory maximum sentence of life imprisonment[,] as required by [18 Pa.C.S.A. §] 1102(a), accompanied by a minimum sentence determined by the common pleas court upon resentencing[?]"[5]

2  Whether the court below abused its discretion in imposing a life without parole sentence on [Marinucci] on re[-]sentencing[?]

3  Whether the court below erred in failing to empanel a sentencing jury to allow the factors that could increase the sentence imposed to be determined beyond a reasonable doubt by a jury[?]

4  Whether the court below erred in imposing a life sentence without the possibility of parole on a juvenile offender, as such sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment, as well as Article 1, Section 13 of the Pennsylvania Constitution[,] which

---

[4] The trial court sentenced Marinucci as follows: Count 1 (murder of the first degree) - life without the possibility of parole; Count 2 (murder of the second degree) - life without the possibility of parole; Count 3 (murder of the third degree) - merged with Count 1; Count 4 (conspiracy to commit homicide) - 20 to 40 years in prison; Count 5 (conspiracy to kidnap) - 3 to 20 years in prison; Count 6 (kidnapping) - merged with Count 2.

[5] Although Marinucci did not include a citation for the passage she quotes, it is taken from **Batts I**, 66 A.3d at 297.

provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted[?]"

Brief for Appellant at 6 (footnote added).

In her first issue, Marinucci contends that, when imposing sentence on a juvenile offender who was convicted of murder prior to the United States Supreme Court's decision in *Miller*, a trial court is required to follow the Pennsylvania Supreme Court's holding in *Batts I*. Brief for Appellant at 11. Marinucci points to the *Batts I* Court's statement that juveniles convicted of murder prior to *Miller* "are subject to a mandatory maximum sentence of life imprisonment as required by [18 Pa.C.S.A. §] 1102(a),[6] accompanied by a minimum sentence determined by the common pleas court upon resentencing." Brief for Appellant at 12 (footnote added). Marinucci asserts that, pursuant to this statement, *Batts I* dictates that a juvenile defendant, such as Marinucci, may not be sentenced to life in prison without *some*

---

[6] Pursuant to 18 Pa.C.S.A. § 1102(a), a person convicted of murder of the first degree shall be sentenced to death or life in prison. However, in response to *Miller*, the General Assembly enacted 18 Pa.C.S.A. § 1102.1, which established a new sentencing scheme for juveniles convicted of homicide offenses after June 24, 2012. Because Marinucci was convicted of first-degree murder prior to that date, section 1102.1 does not apply to her re-sentencing. Nevertheless, Pennsylvania courts have been guided by section 1102.1 in re-sentencing juveniles under section 1102(a), as it permits courts to consider certain age-related factors (*i.e.*, age, mental capacity, maturity, the degree of criminal sophistication exhibited by the defendant, the nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant, probation or institutional reports, and any other relevant factors). *See Lofton*, 57 A.3d at 1276-77.

possibility of parole. *Id*. at 12. Marinucci argues that, pursuant to *Batts I*, the trial court, when re-sentencing her, was required to impose a sentencing range with a minimum sentence and a maximum sentence. *Id*. at 14. Marinucci also argues that the trial court should have applied 42 Pa.C.S.A. § 9756(b)(1), which provides that "[t]he court shall impose a minimum sentence of confinement which shall not exceed one-half of the maximum sentence imposed." Brief for Appellant at 14 (citing 42 Pa.C.S.A. § 9756(b)(1)). Marinucci claims that the trial court's imposition of a sentence of life in prison without the possibility of parole constitutes an illegal sentence,[7] which must be vacated. Brief for Appellant at 15.[8]

A challenge to the legality of a sentence may be entertained as long as the reviewing court has jurisdiction. *Commonwealth v. Batts*, 125 A.3d 33, 45 (Pa. Super. 2015) (hereinafter "*Batts II*"). Issues relating to the legality of a sentence are questions of law; therefore, our standard of review is *de novo* and our scope of review is plenary. *Id*. at 45-46.

Because Marinucci reiterates the same argument that was unsuccessful before the *Batts II* panel, we cannot reassess those claims

---

[7] Marinucci asserts that the only sentencing statute in effect at the time of her conviction, mandating a life without parole sentence, was deemed unconstitutional by *Miller* when imposed upon a juvenile. Brief for Appellant at 14. To the extent that Marinucci argues that 18 Pa.C.S.A. § 1102 is unconstitutional in light of *Miller*, our Supreme Court has expressly rejected that argument. *See Batts I*, 66 A.3d at 294-96.

[8] Notably, Marinucci concedes elsewhere in her brief that, pursuant to *Miller*, a trial court is not foreclosed from imposing a life-without-parole sentence on a juvenile offender. Brief for Appellant at 20, 28.

herein. **See Batts II**, 125 A.3d at 46 (declining to read **Batts II** as categorically prohibiting a sentence of life without parole for juveniles sentenced before **Miller**); **see also Commonwealth v. Beck**, 78 A.3d 656, 659 (Pa. Super. 2013) (stating that a three-judge panel "is not empowered to overrule another panel of the Superior Court") (citations omitted); **see also** Trial Court Opinion, 10/28/15, at 14-23.

In her second issue, Marinucci contends that the trial court "abused its discretion and demonstrated partiality, prejudice, bias and/or ill[-]will [when] resentencing [her]." Brief for Appellant at 15. Marinucci asserts that, although the trial court "ostensibly addressed each of the factors which must be considered pursuant to **Miller**, [it] abused its discretion in disregarding [] numerous pieces of evidence[,]" including Marinucci's maturation and rehabilitation, and the numerous programs in which she has participated while in prison. **Id**. at 16. Marinucci claims that the trial court's concern that Marinucci may have manipulated her behavior in anticipation of re-sentencing is unfounded, as "there were numerous certificates [of] achievement that pre-dated [] **Miller**." **Id**. at 17.

Marinucci points out that the trial "court *sua sponte* inquired [of] Dr. [Bruce] Wright … whether [] Marinucci may have been engaging in modeling behavior for the purpose of trying to look good for the re[-]sentencing[.]" **Id**. at 17. Marinucci claims that, although Dr. Wright opined that Marinucci *could* manipulate, he "made no assertions that she *did* in fact manipulate."

*Id*. (emphasis in original). Marinucci argues that the trial court abused its discretion by "apparently completely adopting the testimony of Dr. [] Wright," and "disregarding and/or discounting the testimony of Dr. Stephen Zerby," who testified regarding evidence of Marinucci's maturation and rehabilitation. *Id*. at 19.

Marinucci further asserts that the trial judge's following comments provide evidence that the judge had already decided Marinucci's sentence before the re-sentencing hearing:

> After 10 years as a prosecutor, [and] 17½ [years] as a judge, I have both tried many cases and presided over many cases. I can't think of one case that is more troubling than this one[,] or very few cases that have caused me nightmares. This one has. I thought after I presided over [Marinucci's] first trial [] that, well, now I've heard it[,] I'm used to it. But[,] you don't get used to it. You hear it again and it's traumatic the second time. It's traumatic the third time. And then because I sentenced all six defendants, then I had to go through the sentencing of each one. And, you know, we hear about post-traumatic stress, and that word is thrown around lightly, but I think if ever there was a case that I could imagine myself having post-traumatic stress from[,] it's this case.

*Id*. at 18 (citing N.T., 7/1/15, at 127). Marinucci also points to the trial judge's comment that, while at the hospital after sustaining an injury to her knee, the judge had physically recoiled at the sight of the crutches she was given to use, because a metal crutch had been used by Marinucci and her co-defendants as a weapon to strike the victim. *Id*. at 18 (citing N.T., 7/1/15, at 127-28). Marinucci claims that these comments demonstrate that the trial judge allowed her personal bias, and evidence presented in the

co-defendant's cases, to influence her sentencing decision. Brief for Appellant at 18-19. Marinucci argues that, "[w]hile it is certainly appropriate to consider the effect of a crime on a victim with respect to sentencing, the personal effect on the judge should never be a consideration." *Id*. at 19.

We review Marinucci's challenge to the trial court's weighing of sentencing factors, including those age-related ones, as a challenge to the discretionary aspects of her sentence. *See Batts II*, 125 A.3d at 43 (wherein this Court reviewed a juvenile appellant's challenge to a life without parole prison sentence, re-imposed on remand following *Miller*, as a challenge to the discretionary aspects of sentencing); *see also Commonwealth v. Seagraves*, 103 A.3d 839, 842 (Pa. Super. 2014) (wherein this Court reviewed a juvenile appellant's challenge to a life without parole prison sentence, re-imposed on remand following *Miller* and *Batts I*, for an abuse of discretion).

A challenge to the discretionary aspects of a sentence is not appealable as of right; instead, an appellant must petition for permission to appeal. *See Commonwealth v. Colon*, 102 A.3d 1033, 1042 (Pa. Super. 2014). We evaluate the following factors to determine whether to grant permission to appeal a claim pertaining to the discretionary aspects of sentencing:

> Before we reach the merits of this issue, we must engage in a four[-]part analysis to determine: (1) whether the appeal is timely; (2) whether [a]ppellant preserved his issue [at sentencing or in a motion to reconsider and modify sentence];

(3) whether [a]ppellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence [as required by Pennsylvania Rule of Appellate Procedure 2119(f)]; and (4) whether the concise statement raises a substantial question that the sentence is appropriate under the sentencing code. The third and fourth of these requirements arise because [a]ppellant's attack on his sentence is not an appeal as of right. Rather, he must petition this Court, in his [Rule 2119(f)] concise statement of reasons, to grant consideration of his appeal on the grounds that there is a substantial question. [I]f the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case.

**Commonwealth v. Edwards**, 71 A.3d 323, 329-30 (Pa. Super. 2013) (citations omitted).

In the instant case, Marinucci filed a timely Notice of Appeal and preserved some of her discretionary aspects claims in a timely post-sentence Motion.[9] However, Marinucci failed to include in her appellate brief a separate Pa.R.A.P. 2119(f) statement. **See** Pa.R.A.P. 2119(f) (stating that "[a]n appellant who challenges the discretionary aspects of a sentence in a criminal matter shall set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence."). Because the Commonwealth has objected to this defect, we are precluded from addressing Marinucci's discretionary aspects claim. **See Batts II**, 125 A.3d at 44 (declining to review a discretionary aspects claim where the appellant's brief did not include a Rule 2119(f) statement,

---

[9] Marinucci failed to raise her claim of bias before the trial court, either at sentencing or in her post-sentence Motion. Therefore, her bias claim is waived. **See** Pa.R.A.P. 302(a) (providing that issues not raised in the lower court are waived and cannot be raised for the first time on appeal).

and the Commonwealth objected to this defect); *see also Commonwealth v. Roser,* 914 A.2d 447, 457 (Pa. Super. 2006) (holding that, if a defendant fails to include an issue in his Rule 2119(f) statement, and the Commonwealth objects, then the issue is waived, and this Court may not review the claim).[10]

In her third issue, Marinucci contends that, although there is no provision in Pennsylvania law to utilize a sentencing jury in non-capital cases, "the trend of [] United States Supreme Court jurisprudence suggests that utilizing a jury is necessary in the instant case to determine the appropriate sentence." Brief for Appellant at 20-21. Marinucci points to the United States Supreme Court decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Alleyne v. United States*, 133 S. Ct. 2151 (2013), and asserts that, "when this line of cases is interwoven with *Miller* [] and *Batts* [*I* ], it becomes apparent that using a jury to determine the sentence in the instant matter is necessary to avoid running afoul of the Constitution, along with *Apprendi* and its progeny." Brief for Appellant at 23. Marinucci claims that "any of the factors listed in *Miller* and *Batts I* can cause the minimum sentence to be increased" and, therefore, should be treated as elements of the offense

---

[10] Even if Marinucci's second issue had not been waived, we would conclude that it lacks merit for the reasons set forth by the trial court. *See* Trial Court Opinion, 10/28/15, at 23-25; *see also id*. at 19-23 (wherein the trial court explained the numerous factors that it considered when re-sentencing Marinucci).

which must be determined by a jury rather than by a trial court judge. *Id*. at 24-25. Marinucci argues that "[a]llowing a sentencing judge to make such important determinations of fact, such as deciding whether a person has capacity for change or potential for rehabilitation, usurps the role of the jury, which violates the Constitution." *Id*. at 26.

The trial court addressed Marinucci's third issue, set forth the relevant law, and determined that it lacks merit. *See* Trial Court Opinion, 10/28/15, at 26-27. We agree with the reasoning of the trial court, and affirm on this basis as to Marinucci's third issue. *See id*.

In her final issue, Marinucci concedes that "neither the United States Supreme Court nor the Pennsylvania Supreme Court have categorically precluded the possibility of life without parole for juvenile offenders." Brief for Appellant at 26; *see also id*. at 28 (wherein Marinucci concedes that the United States Supreme Court has "declined to hold that a life without parole sentence [is] *per se* unconstitutional" in juvenile homicide cases). Nevertheless, Marinucci contends that, based on "the Eighth Amendment's prohibition against cruel and unusual punishment, coupled with the Appellate Courts' trend recognizing that juvenile offenders are fundamentally different from adult offenders, [] any sentence of life without the possibility of parole imposed against a juvenile offends the Constitutions of the United States and the Commonwealth of Pennsylvania." *Id*. at 26-27. Marinucci asserts, that over the past decade, the United States Supreme Court has continually

recognized that, because juvenile offenders are fundamentally different from adult offenders, they require different treatment and increased protections under the law. *Id*. at 27-28. Marinucci's counsel indicates his belief that, in light of this trend, the Supreme Court will ultimately rule that the Eighth Amendment bans all life without parole sentences for juvenile offenders. *Id*. at 29.[11]

Although framed as a challenge to the constitutionality of her sentence, Marinucci concedes that, under the current state of the law, her sentence of life in prison without the possibility of parole is not unconstitutional. *See Batts I*, 66 A.3d at 294-96 (wherein our Supreme Court ruled that *Miller* did not categorically bar the imposition of a life-without-parole sentence on a juvenile); *see also Batts II*, 125 A.3d at 46 (holding that the trial court's sentence of life without the possibility of parole, imposed on a juvenile after consideration of his individual circumstances and age-related characteristics, was a legal sentence under *Miller* and *Batts I*). Although the United States Supreme Court may ultimately deem such sentences unconstitutional, at present, they are not. *See Miller*, 132 S. Ct. at 2469 (wherein the Court stated that "[a]lthough we do not foreclose a sentencer's ability to [impose a sentence of life without the possibility of parole] in [juvenile] homicide cases, we require it

---

[11] Notably, the *Miller* Court specifically declined to consider the appellants' alternative argument that the Eighth Amendment requires a categorical bar on life without parole sentences for juveniles. *See Miller*, 132 S. Ct. at 2469.

to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."). Accordingly, pursuant to controlling case law, including **Miller**, **Batts I** and **Batts II**, we are constrained to reject Marinucci's final issue, and affirm the judgment of sentence imposed by the trial court.[12]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/17/2016

---

[12] We observe that, on April 19, 2016, our Supreme Court granted allowance of appeal of **Batts II**.

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,
PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    )
    )
    VS.    )
    )    No.    850 C 2010
ANGELA MARINUCCI,    )
    Defendant.    )

## OPINION AND ORDER OF COURT

This matter comes before the court for consideration on the Defendant's Motion to Empanel a Sentencing Jury that has been filed in the above-captioned case.

## RELEVANT PROCEDURAL HISTORY:

The Defendant, Angela Marinucci, ("Marinucci"), was convicted in the above-captioned matter on or about May 19, 2011 of Murder of the First Degree (18 Pa. C.S.A. §2502(a)), Murder of the Second Degree (18 Pa. C.S.A. §2502(b)), Murder of the Third Degree (18 Pa. C.S.A. §2502(c)), Criminal Conspiracy – Murder of the First Degree (18 Pa. C.S.A. §903(a)(1)), Criminal Conspiracy – Kidnapping (18 Pa. C.S.A. §903(a)(1)), and Kidnapping (18 Pa. C.S.A. §2901(a)(3)) following a jury trial held before this Court on May 2 – May 19, 2011. On August 3, 2011, she was sentenced by this Court, at Count 1, Murder of the First Degree, to life in prison without the possibility of parole, at Count 2, Murder of the Second Degree, to life in prison without the possibility of parole concurrent to Count 1, at Count 3, Murder of the Third Degree merged with Count 1, At Count 4, Criminal Conspiracy to Commit Homicide, 20 to 40 years incarceration concurrent to Count 1, At Count 5, Criminal Conspiracy to Commit Kidnapping, 3 to 20 years incarceration concurrent to Count 1, and Count 6, Kidnapping, merged with Count 2. Post Sentence Motions were timely filed by the Defendant on or about August 10, 2011. A

1



hearing was held on the Post Sentence Motions before this Court on October 28, 2011, and the Post Sentence Motions were denied by Opinion and Order of Court, dated May 31, 2012. A timely appeal to the Pennsylvania Superior Court ensued. Counsel for the Defendant filed a Concise Statement of Errors Complained of on Appeal on or about June 19, 2012, as directed by Order of this Court, dated June 11, 2012. This Court issued its opinion in accordance with Pa.R.A.P. 1925(a) on or about June 25, 2012. On or about August 26, 2013, the Pennsylvania Superior Court issued a Memorandum Opinion, affirming the Defendant's convictions, but vacating the judgment of sentence and remanding for re-sentencing based on *Miller v. Alabama*, 132 S.Ct. 2455 (2012); *Commonwealth v. Batts*, 66 A.3d 286 (Pa. 2013); *Commonwealth v. Lofton*, 57 A.3d 1270 (Pa. Super 2012) and *Commonwealth v. Knox*, 50 A.3d 732 (Pa. Super. 2012). *Commonwealth v. Marinucci*, 83 A.3d 1073 (Pa. Super. 2013). (Unpublished memorandum). The instant Motion to Empanel a Sentencing Jury was filed along with a Motion to Schedule Sentencing on or about April 7, 2015. A briefing schedule was issued by Order of Court on May 5, 2015 and the matters are scheduled to be heard before this Court on June 30, 2015. A Memorandum in Support of the Request to Empanel a Sentencing Jury was filed by the Defendant on or about May 26, 2015. A Memorandum in Opposition to Defendant's Motion to Empanel a Sentencing Jury was filed by the Commonwealth on or about June 16, 2015.

## ISSUES PRESENTED:

1. **Whether a sentencing jury should be empanelled in a non-capital case?**

In her Motion to Empanel a Sentencing Jury, Marinucci seeks to have this Court enter an order empanelling a jury for purposes of making factual determinations relevant to sentencing in the above captioned matter. In support of this position, Marinucci argues that "[t]he trend of the U.S. Supreme Court case law has demonstrated an increased role for the jury in determining the

2

sentenced imposed on a convicted Defendant. The rationale for this increased role has been to insure that the defendant's right to a jury guaranteed by the Sixth Amendment is preserved." (Defendant's Memorandum in Support of Request to Empanel a Sentencing Jury, p. 2, ¶4). The Defendant cites to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000), *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531 (2004), and *Alleyne v. United States*, 570 U.S. _____, 133 S.Ct. 2151 (2013), in support of her position. The Defendant alleges that when this line of cases is interwoven with *Miller* and *Batts*, *supra*, "it becomes apparent that using a jury to determine the sentence in the instant matter is necessary to avoid running afoul of the Constitution, along with *Apprendi* and its progeny." (Defendant's Memorandum in Support of Request to Empanel a Sentencing Jury, p. 4, ¶ 2). The Defendant also notes that sentencing juries exist in other jurisdictions, including Arkansas, Kentucky, Missouri, Oklahoma, Texas and Virginia. (Defendant's Memorandum in Support of Request to Empanel a Sentencing Jury, p. 2, ¶ 3).

Conversely, the Commonwealth argues that the Defendant's reliance upon *Apprendi*, *Blakely* and *Alleyne* in support of her position that she has the right to have a jury determine her sentence is misplaced. The Commonwealth argues that the aforementioned cases "provide that a defendant is entitled to have a jury determine the existence of any element that requires an increased sentence be imposed upon the defendant." (Commonwealth's Memorandum In Opposition To Defendant's Motion to Empanel a Sentencing Jury, p. 1, ¶ 1). The Commonwealth alleges that the Defendant's position is without merit "since there is no fact that the Commonwealth must prove beyond a reasonable doubt pursuant to *Apprendi*, *Blakely* and *Alleyne* in order that a life sentence may be imposed upon the defendant." (Commonwealth's Memorandum In Opposition To Defendant's Motion to Empanel a Sentencing Jury, p. 2, ¶ 1).

3

The Commonwealth also argues that there are no procedures or rules that have been established by the courts or the legislature in Pennsylvania in order to permit a jury to sentence a defendant in a non-capital case and that the trial court has no authority to enact, on its own, procedures for sentencing in a non-capital case.

It is well-settled that sentencing is a "matter vested in the sound discretion of the sentencing judge." *Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1265 (Pa. Super. 2014), *citing Commonwealth v. Hoch*, 936 A.2d 515, 517-518 (Pa. Super. 2007). The Defendant concedes that she has not produced any statutory authority or any authority from the appellate courts of Pennsylvania, nor is this Court aware of any, in support of her position.[1] In Pennsylvania, a jury may be empanelled for purposes of sentencing only under the authority of 42 Pa. C.S. §9711, setting forth the sentencing procedures for murder of the first degree, in which the jury determines whether the defendant shall be sentenced to death or life imprisonment. *42 Pa.C.S. §9711.* 42 Pa.C.S. §9711 sets forth, at length, the specific procedures and criteria to be followed. Since this is not a case in which the death penalty is implicated, the sentencing must, of necessity, fall within the sound discretion of the trial court without the impermissible use of a jury.

Further, the Pennsylvania Superior Court specifically remanded the case *sub judice* to the trial court for resentencing based on *Miller v. Alabama*, 132 S Ct. 2455 (2012); *Commonwealth v. Batts*, 66 A.3d 286 (Pa. 2013); *Commonwealth v. Lofton*, 57 A.3d 1270 (Pa. Super 2012) and *Commonwealth v. Knox*, 50 A.3d 732 (Pa. Super. 2012). These cases provide specific guidance to the trial court, regarding appropriate age-related factors that the trial court is to consider at the

---

[1] The Defendant states "Although there is admittedly no provision in the current laws or rules of court of Pennsylvania either passed by the General Assembly or promulgated by the Pennsylvania Supreme Court to utilize a sentencing jury in non-capital cases, the general trend of the United States Supreme Court jurisprudence suggests the necessity of using a jury to determine the appropriate sentence under the unique circumstances presented herein." (Defendant's Memorandum In Support of Request To Empanel Sentencing Jury, p. 2, ¶ 2).

4

time of resentencing. In *Commonwealth v. Batts*, 620 Pa. 115, 133, 66 A.3d 286, 297 (Pa. 2013), the Pennsylvania Supreme Court set forth the factors trial courts have been instructed to consider by the Superior Court when fashioning a sentence:

> [A]t a minimum it should consider a juvenile's age at the time of the offense, his diminished culpability and capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, his mental health history, and his potential for rehabilitation.

*Id., quoting Commonwealth v. Knox,* 530 A.3d 732, 745 (Pa. Super. 2012), (citing *Miller,* ——— U.S. at ———, 132 S.Ct. at 2455).

Thus, our appellate courts have made clear that it is the trial courts that are tasked with determining the appropriate sentence, and in accordance with that direction, the appellate courts have provided the appropriate factors to be considered by that sentencing court.

Moreover, this Court finds the Pennsylvania Superior Court case, *Commonwealth v Newman*, 99 A.3d 86 (Pa. Super 2014), to be instructive in this matter. In *Newman*, the Superior Court reviewed the constitutionality of 42 Pa.C.S. § 9712.1 and found that *Alleyne v. United States, supra,* rendered that section unconstitutional. *Id.* at 104. Notably, the Commonwealth argued in that case that, in the event the appellate court found the section to be unconstitutional, the proper remedy was to "remand for the empanelling of a sentencing jury for the determination, beyond a reasonable doubt, as to whether the conditions obtain under the evidence, such that a mandatory minimum sentence should be imposed." *Newman* at 101. The *Newman* Court did not accept the Commonwealth's proposed remedy. The *Newman* Court, in reaching its holding, stated:

> The Commonwealth's suggestion that we remand for a sentencing jury would require this court to manufacture whole cloth a replacement

5

enforcement mechanism for Section 9712.1; in other words, the Commonwealth is asking us to legislate. We recognize that in the prosecution of capital cases in Pennsylvania, there is a similar, bifurcated process where the jury first determines guilt in the trial proceeding (the guilt phase) and then weighs aggravating and mitigating factors in the sentencing proceeding (the penalty phase). However, this mechanism was created by the General Assembly and is enshrined in our statutes at 42 Pa.C.S.[ ] § 9711. We find that it is manifestly the province of the General Assembly to determine what new procedures must be created in order to impose mandatory minimum sentences in Pennsylvania following *Alleyne.* We cannot do so.

*Newman* at 102.

Likewise, in ***Commonwealth v. Mosley***, 2015 WL 1774216, the trial court presented the jury with a special verdict form. The form included a specific issue regarding the weight of drugs possessed by Mosely, thus, appearing that that issue of the weight of the drugs was determined, beyond a reasonable doubt, by the jury as fact finder. However, the Superior Court of Pennsylvania found that the "trial court exceeded its authority by permitting the jury, via a special verdict slip, to determine beyond a reasonable doubt the factual predicate of section 7508—whether Mosley possessed cocaine that weighed greater than 10 grams." *Id.* at 15. The Superior Court stated that "the trial court performed an impermissible legislative function by creating a new procedure in an effort to impose the mandatory minimum sentence in compliance with *Alleyne.*" *Id.* The Superior Court vacated the defendant's judgment of sentence and remanded for resentencing. While admittedly *Newman* and *Mosely* involve a jury finding the existence of a fact that, if proven, requires a mandatory sentence and the instant case does not, nonetheless, the relief that is being requested is the same. The Defendant is asking the court to perform an impermissible legislative function by creating a new procedure which would pass the sentencing function from the sound discretion of the sentencing judge to a jury.

Finally, on October 25, 2012, the Pennsylvania Legislature passed new legislation setting forth the sentence for persons who commit murder, murder of an unborn child and murder of a

6

law enforcement officer prior to the age of 18. *18 Pa.C.S.A. § 1102.1.* This statute expressly applies only to defendants convicted after June 24, 2012. *Id.* As the trial court sentenced Marinucci on August 3, 2011, this statute is inapplicable to the case at bar. Nonetheless, the statute provides specific guidance to the court on the various individualized factors to consider when fashioning a sentence, including the nature and circumstances of the offense, the defendant's age, mental maturity, culpability and degree of criminal sophistication. *18 Pa.C.S.A. §1102.1(d).* Notably absent from this legislation is any authority for a sentencing jury.

Without any type of authority for a novel sentencing procedure as suggested by the Defendant before this Court, empanelling a sentencing jury in a non-capital case is impermissible.

Therefore, the following Order shall issue:

7

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
VS. )
) No.    850 C 2010
ANGELA MARINUCCI, )
Defendant. )

## ORDER OF COURT

**AND NOW,** this __25th__ day of June, 2015, for the reasons set forth in the preceding Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that the Defendant's Motion to Empanel a Sentencing Jury is hereby **DENIED** and the Defendant shall be resentenced by this Court on June 30, 2015 at 9:00 a.m., as previously scheduled by Order of Court, dated May 5, 2015.

BY THE COURT:

_____, J.
Rita Donovan Hathaway, Judge

ATTEST:

_____
Clerk of Courts

c.c.    File
      John W. Peck, District Attorney
      Leo Ciaramitaro, Esq., Assistant District Attorney
      Chuck Washburn, Esq., Assistant District Attorney
      Michael DeMatt, Esq., Counsel for the Defendant
      Pamela Neiderhiser, Esq., Court Administrator's Office

8

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    )
                               )
                               )
          V.                   )
                               )
                               )     NO. 850 C 2010
ANGELA MARINUCCI,           )
                               )
          Defendant.   )

## OPINION AND ORDER OF COURT

This matter comes before the court for consideration of the Defendant's Post-Sentence Motions that have been filed in the above-captioned case.

## FACTUAL HISTORY:

The charges in this matter arise from incidents occurring between February 8, 2010 and February 11, 2010 in Greensburg, Westmoreland County, Pennsylvania, which resulted in the brutal torture and murder of Jennifer Daugherty. The facts as set forth herein are derived from testimony presented at the trial of this matter that occurred between May 2 and May 19, 2011.

Jennifer was 30 years old at the time of her murder. (TT 1147).[1] Although Jennifer lived with her mother and stepfather, Denise and Bobby Murphy, she strove to be as independent as possible. (TT 1148-49). Bobby Murphy testified that while Jennifer was able to take care of her

---

[1] Numerals in parenthesis preceded by the letters "TT" refer to specific pages of the transcript of the testimony presented at trial, held May 2 -19, 2011, and made a part of the record herein.

1

B

basic needs, he worried about her living by herself because she was extremely trusting and naïve. (TT 1167). Mrs. Murphy testified that she was in charge of her daughter's financial affairs, and was the payee for Jennifer's Social Security Disability benefits. Ms. Murphy also testified that Jennifer was "very easygoing, [and] she liked to have fun, she was very trusting, she made friends very easily . . ." (TT 1147).

On or about February 8, 2010, Jennifer Daugherty traveled from Mount Pleasant, Pennsylvania to Greensburg, Pennsylvania by bus to visit with friends and attend a doctor's appointment. When her step-father, Robert Murphy, dropped her off at the bus station, it was the last time a family member saw Jennifer Daugherty alive.

After Jennifer travelled to Greensburg, she arrived at an apartment occupied by Ricky Smyrnes. Anthony Zappone testified that he was familiar with the apartment located at 428 North Pennsylvania Avenue in the City of Greensburg (hereinafter "the apartment"). His cousin, Robert Cathgart, lived there, but it was known as a place where others stayed periodically. Some of those others included Ricky Smyrnes, Peggy Miller, Robert Masters, Angela Marinucci (hereinafter "Defendant") and the victim, Jennifer Daugherty. (TT 337-339). Zappone knew Ricky Smyrnes was dating both Jennifer Daugherty and the Defendant in January and February, 2010. (TT 339-340, 358-359). He also testified that he had overheard Jennifer and Defendant arguing over Smyrnes in the past. (TT 359, 374-75, 378-79).

Zappone testified that on Monday, February 1, 2010, he accompanied Ricky Smyrnes, Defendant, Peggy Miller, and Robert Masters to the bus station to meet Melvin Knight and Amber Meidinger. (TT 341, 362-63). Zappone asked to stay at the apartment that night, but Smyrnes denied the request. Zappone testified that he tried to return to the apartment several times during that week, but was not permitted into the building, even to retrieve his belongings.

2

Finally, on February 5, 2010, Zappone went to the apartment and spoke with Ricky Smyrnes. (TT 341-42, 364-66).

Although Zappone was not permitted into the apartment, Smyrnes gave him his sweatshirt and the two stood on the porch and smoked cigarettes. Zappone testified that during this time, he overheard Smyrnes' cell phone conversation with Jennifer Daugherty. Although Zappone knew that Defendant was Smyrnes' other girlfriend, Smyrnes was talking of love and marriage to Jennifer. (TT 343-45). Defendant then appeared at the door to the porch where Smyrnes was having the conversation with Jennifer, and where she could overhear the conversation, and stated, "I'm going to kill that bitch." (TT 345-48). Zappone testified that Smyrnes reacted immediately, "like he had just been caught." (TT 349). Zappone never had any contact with Smyrnes, Defendant, Masters or Miller after that date. (TT 349).

Amber Meidinger, a co-defendant, testified against Defendant at trial. Meidinger prefaced her testimony by stating that she had asked to speak to the District Attorney's Office against the advice of her attorneys, and to testify at trial, because, "I feel that was the right thing for me to do. Um, I couldn't do anything else but to come in here and tell the truth of what happened . . . I did want to speak the truth to the family because that's the least what I can do. I can't do nothing else. I can't bring that family member back, so I came in here to speak the truth." (TT 742). She indicated that she had been made no promises for her testimony, and that she had received no deals, plea offers, or preferential treatment in exchange for her testimony. (TT 744-45).

Meidinger testified that she met Melvin Knight while residing in a shelter, and met Marinucci and the other co-defendants for the first time at the bus garage in Greensburg on February 8, 2010. Meidinger indicated that she also met Jennifer Daugherty on that date. (TT

3

752-54). Meidinger testified that she had a conversation with Jennifer Daugherty that was overheard by Defendant, wherein Jennifer told Meidinger that she was going to marry Ricky Smyrnes. (TT 755). Meidinger perceived tension between Defendant and Jennifer: "Um, there was a lot of tension. I could observe a lot of jealousy. I could observe they really didn't so much care for each other." (TT 756). When Jennifer left the group to go to the library, however, Meidinger observed Defendant and Smyrnes holding hands and acting as if they were "together." (TT 757).

After meeting Knight and Meidinger, Defendant walked with them back to the Knights Inn, where they had been staying. While at the Knights Inn, Defendant spoke with Smyrnes on her cell phone. Meidinger overheard the conversation, during which Defendant said to Smyrnes, "I hope you're not with that bitch." (TT 759).

Meidinger and Knight eventually rejoined Ricky Smyrnes at the apartment later that evening. Also present were Robert Masters, Peggy Miller (his fiancé), "Jason," (last name unknown) and later, Jennifer Daugherty. (TT 761-65). After "Jason" had left, Meidinger testified that Jennifer wanted to be intimate with Ricky Smyrnes, but that Smyrnes was not interested. In fact, he became angry with Jennifer. (TT 767).

On Tuesday, February 9, 2010, Meidinger left the apartment with her caseworker to obtain some clothing. When she returned to the apartment, she learned that Jennifer Daugherty had a doctor's appointment at 3:00 p.m.; however, she decided not to keep the appointment. This frustrated Smyrnes and Knight, and led to an argument between Knight, Smyrnes, and Jennifer. (TT 770-72). Meidinger testified that Daugherty retreated to the bathroom and took a shower. It was then that Smyrnes called Defendant on a cell phone (using the speaker function) and told her

4

that Jennifer had tried to have-sex with him the night before. Defendant responded by stating that was not right, because "that was her man." (TT 772-73).

The group then decided that it would be funny to embarrass Jennifer. Meidinger, Knight, Miller, Masters, and Smyrnes rifled through Jennifer's purse and removed some of her belongings. They removed cash, a gift card, and Jennifer's cell phone. They also poured toothpaste and mouthwash on her clothing and purse. (TT 773-76). Meidinger testified that this humiliation of Jennifer continued throughout that day, but that Melvin Knight became physical with her when she began resisting their "fun." Knight grabbed Jennifer by the shirt, knocked her into a wall and began choking her. (TT 779-81).

Meidinger testified that Defendant arrived at the apartment a short time later, upset because Jennifer had tried to sleep with Smyrnes. Defendant confronted Jennifer, but when Jennifer stated that she had done nothing wrong, she pushed Jennifer into the bathroom towel rack three times, hitting her chest and head. (TT 782-83). Defendant then told Meidinger that Jennifer "liked" Melvin Knight. This angered Meidinger, who disregarded Jennifer's denials, and continued the physical assault that Defendant had started. (TT 784). Knight and Smyrnes then dragged a crying Jennifer out of the bathroom and began pouring water and spices on her head. They then forced Jennifer to take a shower, proclaiming that "she stinks." (TT 785-86). When Robert Cathcart (the original tenant on the apartment's lease) phoned to inform the residents that he was coming to remove his property, Smyrnes and Knight forced Jennifer into the attic so that Cathcart would not know that she was there. (TT 787). Notably, the police responded to a disturbance at the apartment during Cathcart's visit when an altercation erupted between Cathcart, Smyrnes and Knight. They spoke with the three men outside, and did not have cause to enter the apartment. (TT 790-91).

5

It was then that Smyrnes and Knight decided that it was time to "humiliate Jen and embarrass her." (TT 792). They forced her to take off her pajamas and then threw them outside onto the porch roof. When the Defendant remarked that "Jennifer was ugly," Knight and Smyrnes cut her hair with scissors and then forced Jennifer to clean up their mess. (TT 792-93). When Jennifer asked why they were doing this to her, Smyrnes and Knight responded that "you're ugly, and nobody is ever going to want you." (TT 793). Meidinger testified that Knight then grabbed Jennifer, took her into the living room, stuffed a sock into her mouth, and raped her. (TT 794-95).

Defendant then decided to call her home and tell her family that she planned on spending the night at the apartment. (TT 796-97). Meidinger, Knight, Smyrnes and Defendant walked to Defendant's home to get her medications. She complained to Meidinger that she did not know what Smyrnes saw in Jennifer. After collecting the medications, Smyrnes received a call from Peggy Miller, telling him that Jennifer was trying to escape. Smyrnes and Knight ran to the apartment, where they confronted Jennifer and began beating her. (TT 797-99). They gave her Defendant's Seroquel pills, telling her that it was "headache medicine." (TT 802). The group then left Jennifer in the living room and went to bed.

Meidinger testified that on Wednesday morning, Smyrnes, Knight and Defendant left the apartment to cash a check. Smyrnes instructed Miller, Masters, and Meidinger to keep Jennifer in the apartment, and if Jennifer tried to leave, "something is going to happen to everybody there that tried to help her." (TT 807). When the three returned to the apartment, Defendant confronted Jennifer about drinking soda pop that had been in the refrigerator. Jennifer denied any wrongdoing, stating that she was tired of drinking what everyone else was making her drink. (TT 809-10). Defendant then pushed Jennifer to the floor, climbed on top of her, and began

6

punching her in the face. When Jennifer kneed Defendant in the stomach, she ran to Smyrnes, stating "Jen killed my baby." (TT 811).[2] It was then that Smyrnes called the first of the "family meetings" to discuss Jennifer. (TT 812-13). According to Meidinger, "Ricky asked everybody in the meeting how would Jen or Angela be–how would Jen be an appropriate mother figure, and Angela had stated at that meeting that Ricky had to choose between Jen or herself, and if Ricky chose Jen–if Ricky chose Angie, Angie stated that he would have to get rid of Jen." (TT 813).

Meidinger testified that at this point on Wednesday afternoon, Jennifer was bruised, her hair was shorn, she had a knot on her forehead, and she was groggy from being given the pills. (TT 814). At a second "family meeting," Defendant suggested that Jennifer should be fed "pregnant pee because it's stronger." (TT 815). Defendant then urinated into a cup, and Meidinger forced Jennifer to drink the urine: "I would ask – I would demand Jen to drink the drink while hitting her head with the towel rack." (TT 815). A second "drink" was made, containing Meidinger's feces, spices, parsley, garlic and more urine. Again, Meidinger struck Jennifer in the head with a towel bar until she had consumed the foul mixture. (TT 816). Yet another "drink" was made with Clorox detergent, water, and cigarette ashes. Meidinger testified that some of her medication was also used in these drinks. Again, Jennifer was forced to drink the concoction, and Meidinger testified that Jennifer was crying and throwing up during this process. (TT 816-17).

Knight and Smyrnes decided to bind Jennifer with Christmas tree lights, and Marinucci urged them to plug them in to make sure that they worked, because she wanted Jennifer to look like a Christmas tree. (TT 818). When the lights would not blink, the Defendant, Smyrnes, Knight, and Meidinger removed the bulbs from the strands so that they could use the light strings as ropes to tie Jennifer up. (TT 819). A third "family meeting" was then held, and Smyrnes

---

[2] The testimony presented at trial revealed that Marinucci was not pregnant during the incident.

7

asked whether they should kill Jennifer. At that time, each member of the "family," Smyrnes, Knight, Meidinger, Defendant, Miller, and Masters, voted to kill Jennifer Daugherty. (TT 819-21). Smyrnes then asked Jennifer if she wanted to die.

> Jen said no. And Rick stated, you were trying to kill my kid, why should I let you live. And Jen stated that she did nothing wrong. And Ricky told Jen that he wanted her to write the suicide letter stating when they found her body it would look like a suicide.

(TT 821).

Jennifer then penned a note at Smyrnes' direction, stating that she didn't want to live any more. When she finished, Defendant stated, "Just kill that bitch." (TT 821).

Knight and Smyrnes grabbed the bound Jennifer and took her into the bathroom. Smyrnes told Knight, "You know what to do." (TT 821). Smyrnes obtained a knife from the kitchen and handed it to Knight. Knight initially indicated that he could not do it, but Smyrnes stated, "Well, I can't do it either." (TT 823). Meidinger witnessed Knight as he took the knife into the bathroom, asked Jennifer if she was ready to die, and stabbed Jennifer in the chest, the torso, and the throat. (TT 823-24). Knight came out of the bathroom, stating, "This bitch ain't dead." He handed the knife to Meidinger, who handed it to Smyrnes. Smyrnes then went into the bathroom and cut Jennifer's wrists. (TT 824).

Defendant was annoyed when Jennifer did not immediately die, stating, "Just kill that bitch, I can't believe she's not dead yet." (TT 824). She also complained that Jennifer was interfering in her relationship with Smyrnes, and that she could not understand what Smyrnes saw in Jennifer because Jennifer was retarded. (TT 825). After Smyrnes slit Jennifer's wrists, he returned to the bedroom and reported that "the bitch ain't dead yet." (TT 825). Smyrnes and

8

Knight then wrapped the Christmas lights around Jennifer's throat and choked her with the lights. They then believed that Jennifer was finally dead. (TT 825-26).

Smyrnes called another "family meeting" to decide what they would then do with Jennifer's body. Masters suggested that they place her body on the train tracks. The Defendant suggested that they burn the body in front of a church. Meidinger suggested that they put the body in the trunk of a car. Finally, Smyrnes stated that he was going to obtain a neighbor's trash can and wheel the body somewhere so that no one would be caught. (TT 826-27). When he returned with the garbage can, Jennifer's body was placed into a plastic bag and into the garbage can. Knight and Smyrnes used bleach to clean the floors and towels to wipe up the blood. Defendant remarked that apparently Smyrnes loved her more because he killed Jennifer. (TT 828-29). Knight and Smyrnes then left the apartment with the garbage can. When they returned, they told the others that they had placed Daugherty's body under a truck. (TT 829-30). It was early on the morning of Thursday, February 11, 2010.

Jennifer's body was discovered by Daniel Grant, an employee of Cleveland Brothers, on the morning of February 11, 2010. He found a large black trash can stuffed underneath his work truck that he had parked in the parking lot of the Greensburg Salem Middle School the night before. (TT 103). When he tried to drag the trash can from underneath the vehicle, the lid fell off and he first noted an unusual odor. He then saw that there was a body inside the can. (TT 105). He immediately called 9-1-1. (TT 106). Law enforcement responded promptly, commencing the investigation. Investigators later identified the body as that of Jennifer Daugherty.

Meidinger testified that later that morning, Defendant received a text that someone had found a body at the Greensburg Salem Middle School. While the Defendant and Smyrnes were away from the apartment with Smyrnes' caseworker, Miller received a telephone call from

9

Daugherty's sister who asked if they knew where Daugherty was. Miller told the caller that they did not. Smyrnes called some time later, and told them all to get out of the house, because something had happened. (TT 830-32). After embarking on several errands, Meidinger, Knight, Miller, and Masters were approached by the police, who said that they had some questions for them. The four then accompanied the police to the police station. (TT 836-37).

Meidinger concluded her testimony by recalling that at some point during Jennifer's three-day torture, Defendant confided in her that she had lured Daugherty to Greensburg by using Smyrnes' cell phone to text Jennifer, asking her to come and spend the weekend at the apartment. Defendant told Meidinger that she had been texting Jennifer for three days, using Smyrnes' phone, before Jennifer actually came to Greensburg. (TT 841-42). Denise Murphy, Jennifer's mother, testified that Jennifer began talking about going to Greensburg several days before she actually departed on the bus from Mount Pleasant. (TT 1152). Bobby Murphy, her step-father, testified that Jennifer was on the cell phone constantly that weekend, and told her stepfather she was communicating with "Angela" and "Ricky." (TT 1169-70). On Sunday, February 7, 2010, after she had had a conversation with someone, Jennifer asked her parents if she could go to Greensburg the following day to "spend time at an apartment with Peggy." (TT 1171). They agreed.

Law enforcement first observed Defendant and Smyrnes on February 11, 2010, as they were walking in the vicinity of the apartment at approximately 5:40 p.m. The pair approached Det. Jerry Vernail of the Greensburg Police Department and Det. Frank Galilei of the Westmoreland County Detectives Bureau. Smyrnes engaged Det. Vernail in conversation. Det. Galilei introduced himself to Defendant, who indicated that she was Smyrnes' girlfriend. As it was cold, Det. Galilei offered to let Defendant sit in his car. After engaging in small talk,

10

Defendant indicated that she had spent the previous evening with Smyrnes. She agreed to accompany Det. Vernail, Det. Galilei and Smyrnes to the Greensburg Police station. (TT 1096-1103).

Police initially thought that Defendant, whom they learned was a juvenile at the time, was a witness to the events that had unfolded in the apartment preceding the discovery of Jennifer's body. She was told that she was free to leave at any time and was not in custody. The Defendant initially told Detective Robert Weaver that she had talked to Daugherty the previous weekend and that they had been arguing because Defendant was pregnant with Smyrnes' baby and Jennifer was trying to "get Ricky away from her." (TT 1130). When Jennifer arrived in Greensburg, however, she indicated that the two of them had "hugged and made up. They weren't going to fight about Ricky anymore." (TT 1131). She further told Weaver that everyone was mad at Jennifer because she was trying to interfere with her relationship with Smyrnes. This led to Jennifer being tied up with Christmas garland. (TT 1132-33). When Defendant disclosed that she had punched Jennifer, police terminated the interview.

Defendant made several inculpatory statements to fellow inmates at the Westmoreland County Jail following her arrest. Kasey Burd testified that she was on a prison unit with Defendant, Meidinger, and Miller in February 2010. She testified that she could overhear their conversations, and that she wrote a letter to Judge John Blahovec because "I felt that, um, somebody of authority needed to hear what I was hearing, um, because what I was hearing was appalling." (TT 533). She also had the opportunity to speak with Defendant alone during the next month when their cells were next to each other. Burd testified that Defendant admitted to engaging in a physical assault on Jennifer, told her that she was angry because Daugherty and

11

Smyrnes were having sexual relations, and stated, "I'm the one that wanted her dead." (TT 541, 550).

During that month, Defendant also confided in Burd as to her role in the death of Jenifer Daugherty. She admitted that they all took turns kicking Jen in the stomach when they believed that she was pregnant. She told Burd that they made Jen write a suicide note. She told Burd that she and the others made drinks for Jen (one of which included the Defendant's urine), poured nail polish all over Jen's body, cut her hair, and stabbed her and slit her wrists. She praised Smyrnes, saying, "he did a really good job of cleaning up the blood and everything that was left behind." (TT 542-44, 557, 560-61, 569). She also told Burd about the "family meetings."

Felisha Hardison testified that she also was incarcerated at the Westmoreland County Prison with Defendant. She told Hardison that she had a grudge against Jennifer because she had taken a boyfriend, "Robert," from her in the past. Defendant also told Hardison that Jennifer had taken Ricky from her as well. (TT 589-90). She said that "she had a grudge against her and she wanted her dead." (TT 593-94, 603, 608, 611, 615). The Defendant told Hardison that they forced Daugherty to consume drinks made with urine and bleach and other mixtures. (TT 593). She told her that she kicked her in the stomach and hit her in the face. (TT 600, 604). She said that she and Peggy Miller wrapped Jennifer with Christmas lights. (TT 604, 611).

Joyce Mackey testified that she also had spent time at the Westmoreland County Prison with Defendant. She recalled a conversation that she had with her on February 13, 2011. Mackey testified that she and Defendant were discussing the crimes for which they were incarcerated. Defendant told Mackey that she became jealous of the flirting that was occurring between Jennifer and Smyrnes, so "she punched Jen three times in the face and Jen kicked her three times back in the stomach and made her lose her baby." (TT 622-23). She then told

12

Mackey that "she told Ricky that the bitch must pay." (TT 623). She also told Mackey that she and Meidinger made Daugherty drink a concoction of urine and spices, that she was tied up and placed in the attic. (TT 624-27, 639, 641). When Jennifer was dead, the Defendant told Smyrnes, "I guess you love me more than you liked her because you made her pay." (TT 626).

Tina Warrick was also incarcerated with Defendant at the Westmoreland County Prison. During that time, Defendant told Warrick that Jennifer had been sleeping with her boyfriend, and that it took her four days to get Jennifer to come to the apartment in Greensburg. (TT 652, 662, 672). In another conversation with Warrick, the Defendant stated that she was upset that Peggy Miller had gotten the wrong Christmas lights, because she wanted the Christmas lights to be blinking when Jennifer's body was found. (TT 655-56, 673). Finally, Warrick related two incidents that occurred at meal-time while the Defendant was working as a "unit tray worker." On one occasion, Warrick indicated that she and several other inmates were seated at a table discussing the stew that was served at the prison. When one girl remarked that the stew looked like dog feces, Defendant said, "That's okay, I feed feces to retards." (TT 661). On another occasion, she joked to the other females, "does anybody need a drink, I give bleach to people to drink." (TT 661).

The forensic and scientific testimony that was presented at trial was consistent with the testimony that was received from the lay witnesses. Dr. Cyril Wecht testified as an expert witness in the field of forensic pathology. Dr. Wecht performed the autopsy on the body of Jennifer Daugherty. He testified that he received the body while it was still in a trash can. He noted that the body had been placed head-first into the can, and was partially covered with plastic bags. He also noted that there were strands of Christmas lights with the bulbs removed wrapped around the neck and binding the wrists. (TT 1031-32). The ankles were bound with a

13

"whitish material that had blue decorative particles." (TT 1033). Dr. Wecht observed incised wounds, abrasions and contusions on Daugherty's body, all of which would have been inflicted within days of her death. (TT 1035-36). Dr. Wecht also noted that the toxicology report that was performed as part of the autopsy revealed Sertraline (Zoloft) and Seroquel in Jennifer Daugherty's system. (TT 1060, 1064). He noted that the levels of Sertaline were high, and that cases of death due to the ingestion of that drug had been reported in lower levels than those present in Daugherty. (TT 1060-61, 1064-65).

Following his autopsy, Dr. Wecht concluded that the cause of Jennifer's death was certainly the combination of all her injuries, but primarily due to the "stab wounds of the chest on the left side producing injuries, stab wounds of the left lung and the heart leading to blood, left hemothorax, hemo, blood, thorax, chest cavity, and hemopericardium, blood in the pericardial sac." (TT 1058). Dr. Wecht opined that Jennifer would have remained conscious after the infliction of these wounds, while bleeding, for a couple of minutes, would then have lost consciousness and, within five or six minutes, would have died. (TT 1059).

## ISSUES PRESENTED FOR CONSIDERATION:

### 1. WHETHER THIS COURT IMPOSED AN ILLEGAL SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE

Defendant first alleges that a sentence of life imprisonment without the possibility of parole is illegal under *Commonwealth v. Batts*. 66 A.3d 286 (Pa. 2013). Prior to the United States Supreme Court holding in *Miller v. Alabama*, many states, including Pennsylvania, mandated that any juvenile convicted of first-degree murder as an adult must be sentenced to a term of life imprisonment.[3] The *Miller* Court changed the landscape of juvenile sentencing by holding that

---

[3] 18 Pa.C.S. §1102.1, effective October 25, 2012, establishes a new sentencing scheme for juveniles convicted of homicide offenses after June 24, 2012. Because Defendant was convicted of first-degree murder prior to that date,

14

such mandatory sentences for juveniles are unconstitutional under the Eighth Amendment. *Miller*, 132 S.Ct. 2455, 2466-68 (2012). The Court held that mandatory life-without-parole sentences prevented trial courts from considering juveniles' "diminished culpability and heightened capacity for change." *Id.* at 2469. The Court stressed that the "State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at 2483.

It likened its viewpoint to its holding in *Graham*, which held that life sentences for juveniles convicted of non-homicide offenses were unconstitutional, and *Roper*, which invalidated death sentences for juveniles. *Id.* at 2465-66; *see also Graham v. Florida*, 560 U.S. 48 (2010), *Roper v. Simmons*, 543 U.S. 551 (2005). Specifically, those cases reflect that:

> [I]n imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

*Id.* at 2468.

Thus, the Court stated that "although we do not foreclose a sentencer's ability to [sentence a juvenile to life imprisonment] in homicide cases, we require it to take into account how children are different . . . ." *Id.* at 2469.

---

the statute does not apply to her sentencing. However, Pennsylvania courts have been guided by this statute in resentencing juveniles, as it allows courts to consider age-related factors established by *Miller. See, e.g., Comm. v. Lofton*, 57 A.3d 1270, 1276-77 (Pa.Super. 2012).

15

In the wake of *Miller*, the Pennsylvania Supreme Court determined the appropriate constitutional remedy for juveniles who were mandatorily sentenced to life imprisonment for homicide offenses in *Commonwealth v. Batts*. 620 Pa. 115, 66 A.3d 286 (2013). The Court first recognized that the General Assembly had attempted to grapple with *Miller* by instating a new sentencing scheme under *18 Pa.C.S. §1102.1*, which reads that:

> (a) First degree murder.--A person who has been convicted after June 24, 2012, of a murder of the first degree . . . who was under the age of 18 at the time of the commission of the offense shall be sentenced as follows:
> (1) A person who at the time of the commission of the offense was 15 years of age or older shall be sentenced to a term of life imprisonment without parole, or a term of imprisonment, the minimum of which shall be at least 35 years to life.

For those convicted prior to June 24, 2012, however, who did not fall under the ambit of the new statute—but who had not yet exhausted their direct appeals—the Court asserted that *Miller* did not bar the imposition of a life sentence on a juvenile offense, and only mandated judicial consideration of age-related factors prior to sentencing. *Batts*, 620 Pa. at 296. Thus, it recognized that the best constitutional remedy for a juvenile mandatorily sentenced prior to *Miller* is the imposition of a new sentence considered in light of the factors outlined by the *Miller* Court. *Id*. at 297; *see also Comm. v. Knox*, 50 A.3d 732, 745, (Pa.Super. 2012) ("We emphasize that our disposition does not mean that it is unconstitutional for a juvenile actually to spend the rest of his life in prison, only that the mandatory nature of the sentence, determined at the outset, is unconstitutional.").

Since *Batts*, the Superior Court has upheld trial courts' resentencing of life imprisonment for juveniles where the court considered the established age-related factors prior to resentencing. In *Comm. v. Seagraves*, 103 A.3d 839 (Pa.Super. 2014), the Superior Court considered whether the trial court "abused its discretion when it [re]sentenced [the defendant], who was a juvenile at

16

the time of the crime, to life without parole without properly taking into consideration mitigating factors listed in *Miller v. Alabama.*" *Id.* at 841. The defendant was seventeen years of age at the time the crime was committed. The first degree murder conviction arose from an incident where defendant and an accomplice lured a victim to an obscure location, then brutally murdered him. The court summarized the facts as follows:

> [Appellant], then seventeen, and his adult co-defendant . . .
> planned to lure the victim to an obscure location under a bridge.
> Although the victim believed he was meeting [codefendant] for a
> sexual encounter . . . 'The plan was to meet him. Scare him. Kill
> him.' . . . As planned, once the victim was present, Appellant
> jumped the victim, stabbing him in his throat."

*Id.* at 840.

The trial court noted that "the brutal circumstances of [the victim's] death, the extent of Appellant's participation therein, and the apparent lack of familial or peer pressure to participate also inform our Judgment of Sentence. The case against Appellant contained overwhelming evidence of planning and lying in wait for the victim." *Id.* at 847. The trial court also cited Justice Breyer's concurring opinion in *Miller*, which "opin[ed] that the only juveniles who may constitutionally be sentence[d] to life without parole are those convicted of homicide offenses who kill or intend to kill, differentiating such offenders from those who were convicted of murder as a result of participation in a felony." *Id.* at 847-48.

With Supreme Court precedent in mind, the trial court held that "in the case at bar, there is no indication that Appellant was anything other than a knowing and willing participant in the senseless, premeditated and horrendous slaughter of [the victim]." *Id.* at 848. The court also referenced the trial judge's summation of Appellant's participation in the crime as follows: "'The horrendousness of this, the lack of compassion, the lack of human sympathy for another person I think is justified in allowing the [sentencing] recommendation to be imposed as it is given.'" *Id.*

at 844-45. The court detailed how Appellant spent time planning the commission of the murder, and reflected that he lacked remorse after the crime was committed. *Id.* at 845. Thus, the court resentenced the Appellant to life imprisonment without the possibility of parole. That sentence was affirmed by the Superior Court, which found that its consideration of age-appropriate factors was appropriate.

Similarly, the Superior Court recently affirmed a trial court's resentence of life imprisonment in the latest iteration of *Batts*. 2015 Pa. Super. 187, 2015 WL 5174241. The defendant was 14 years old at the time he participated in a gang-related murder, wherein he shot two other teenage boys. Specifically, the "Appellant, then fourteen years old, walked up the front porch steps of a house, shot Clarence Edwards in the head, and shot Corey Hilario in the back as the man attempted to flee." *Batts*, 620 Pa. at 118. The trial court asserted that it had considered the age-appropriate factors in resentencing, and had reviewed the record, trial transcripts, the parties' sentencing memoranda, an investigation report, several psychological evaluations, and a letter from the victim. *Batts,* 2015 WL at *11. The court also explained its weighing of the factors established in *Knox*. *Id*. Based on the court's conclusion that "the factors not in Defendant's favor significantly outweigh[ed] the factors in his favor," the court resentenced him to life in prison without the possibility of parole. *Id.* at *6.

The Superior Court held that such a sentence was appropriate, as *Miller* "did not prohibit either the imposition of a sentence of life without parole or even a mandatory sentence of life with parole for a juvenile." *Id*. at *25. Responding to the Defendant's argument that "*Batts* II . . . categorically precluded the imposition of a sentence of life without parole on juveniles convicted of first-degree murder," the court rejected such a narrow and isolated reading, as it would provide greater protections than those provided under *Miller*. *Id.* at *26.

18

Based on precedent set forth in *Miller* and its Pennsylvania progeny, this Court expansively explored the factors deemed essential in sentencing juveniles convicted of homicide offenses. This Court considered that Defendant was 17 and one-half years of age at the time the crime was committed. Thus, the "penological justifications for imposing the harshest sentences on juvenile offenders" was not as diminished. *Miller*, 132 S.Ct. at 2465. She was, however, younger than the rest of her codefendants. (RT 126, 129).[4] It considered her home, her neighborhood, and her environment. (RT 132). The Defendant enjoyed a middle class upbringing and a stable family unit. (RT 132). This Court considered her past exposure to violence. (RT 133). The Defendant asserted that she was raped at age 13, and that her codefendant Ricky Smyrnes raped her around the time Jennifer Dougherty was murdered. (RT 133). This Court considered her drug and alcohol history. (RT 133). The Defendant gave conflicting reports as to the amount of alcohol she consumed as well as her marijuana usage. (RT 134). This Court considered her mental health history. (RT 134). Here, too, the Defendant offered conflicting reports, often claiming to suffer from many psychotic incidents which made one doctor question their validity. (RT 134). He explained that so many symptoms grouped together would not present themselves simultaneously. (RT 134).

Dr. Wright testified:

> The specific symptoms she described to me were very inconsistent throughout the course of my examination. They were inconsistent as compared to the reports. She first told me when I first questioned her about the psychosis, she had visualizations of her deceased grandmother. These were life-like. As the interview progressed they expanded. She said she was seeing smaller images of her deceased grandmother. She said she was seeing her uncle, she was seeing enemies, and she also saw animals, including horses, tigers and bears. She claimed that some of the images could only be seen in her right eye and the other images in her left eye.

---

[4] Numerals in parenthesis preceded by the letters "RT" refer to specific pages of the transcript of the resentencing hearing, held on June 30 and July 1, 2015, and made a part of the record herein.

> The description is inconsistent with any primary psychiatric disorder raising concerns about the validity of her account of the psychotic symptoms.

(RT 13, 14).

Further, the Defendant asked a fellow inmate for advice on how to "become crazy," reflecting a manipulative attempt to appear mentally ill. (RT 135).

This Court also considered her ability to deal with police. (RT 135). The Defendant openly spoke with police after the crime, and actively lied about her level of participation in the murder of Jennifer Daugherty. (RT 135) This Court considered her capacity to assist her attorney. (RT 135). The Defendant appeared capable of doing so. (RT 135). This Court considered her emotional maturity and development. (RT 135-36). Defendant sought out older friends. She was able to end a potentially dangerous relationship with a man six years her senior, though she claims she was fearful of breaking ties with her codefendant. (RT 136). Although many of her friends were older, she often distinguished herself as a leader in her group of friends. (RT 136-37).

This Court also considered her potential for rehabilitation. (RT 137). The Defendant still has not taken responsibility for her actions, and denies the role she played in the horrific and brutal murder of Jennifer Daugherty. Although she continues to deny her role to the Court, she admitted to a fellow inmate that she lured Jennifer to the apartment because she was sleeping with her boyfriend. (RT 138-39). She stated to an inmate, "I feed feces to retards" and "I give bleach to people to drink." (RT 21). She also threatened to "beat the living crap" out of an inmate who planned to testify against her. (RT 139). This Court found these actions reflect a manipulative personality, since she is able to change her demeanor to achieve her goals. (RT 139).

20

This Court also considered the circumstances of the crime, the defendant's participation in the crime, and whether she has diminished culpability. (RT 139). The Defendant played a major part in the planning and commission of the crime. (RT 139). One week before the murder, she admitted to a friend that she "wanted to kill Jennifer because she did not want to share Ricky." (RT 139). She posed as Ricky Smyrnes by using his phone to text message Jennifer so as to lure her to Greensburg. (RT 148). One witness testified that the Defendant had exhibited jealous behavior toward Jennifer prior to the murder, stating "I'm going to kill that bitch" after hearing Ricky Smyrnes speak on the telephone with Jennifer about "love and marriage." (RT 140). Another codefendant, Amber Meidinger, testified that there was tension between Jennifer and the Defendant based on Ricky Smyrnes. (RT 141). When the Defendant confronted Jennifer about her relationship with Smyrnes shortly before her torture and murder, she pushed her into the bathroom towel rack three times, hitting her head and chest. (RT 142). While her codefendants were embarrassing Jennifer, calling her "ugly" and cutting her hair and scalp, Defendant decided to call her parents and ask permission to spend the night with friends. (RT 142).

The next day, the Defendant confronted Jennifer about drinking soda pop that had been in the refrigerator. (RT 143). Jennifer said that she had done nothing wrong, and the Defendant began punching Jennifer in the face. (RT 143). Jennifer attempted to protect herself by kneeing the Defendant in the stomach. (RT 143). In response, the Defendant ran to Smyrnes, and said "Jen killed my baby." (RT 143-44). During a "family meeting," the Defendant asserted that Ricky must choose between herself and Jen, and that if he chose the Defendant, he would have "to get rid of" Jennifer. (RT 144). That afternoon, Jennifer was bruised and beaten. The Defendant suggested that Jennifer should be fed "pregnant pee because it's stronger." (RT 144).

21

Thus, the Defendant urinated into a cup and forced Jennifer to drink it. (RT 144). Jennifer was then forced to drink various other substances including feces, spices, more urine, and garlic. (RT 145). She began vomiting. (RT 145).

The degradation continued, with the Defendant taking a leading role. (RT 145). During another family meeting that day, the Defendant, along with the others, all voted to kill Jennifer. (RT 145). To this day, the Defendant asserts that she did not participate in the vote. (RT 146). After Smyrnes forced Jennifer to pen a suicide letter, the Defendant exclaimed, "Just kill that bitch." (RT 146). After Jennifer was stabbed but remained alive, the Defendant again exclaimed, "Just kill that bitch. I can't believe she is not dead yet." (RT 146). The Defendant was tortured, humiliated, and endured unimaginable physical and mental agony for three days before she died. After Jennifer died, the Defendant suggested that the group burn Jennifer's body in front of a church. (RT 147). After the group disposed of Jennifer's body in a garbage can, the Defendant attempted to elude and manipulate the officers she spoke to about the circumstances of Jennifer's death. The Defendant stated to one detective that she had only spoken to Jennifer the previous weekend, that they had been arguing because the Defendant was pregnant with Smyrne's child, and that the victim was "trying to get Ricky away from her." (RT 149). However, she continued that after meeting in person, they hugged and made up. (RT 149). After some time had passed, she alleged that the entire group was angry at Jennifer because she was trying to interfere with the Defendant and Ricky's relationship. After being incarcerated, however, she openly bragged to fellow inmates about her involvement in the murder. (RT 150).

This Court noted on the record during resentencing, and will repeat herein, that it did not take the matter of resentencing lightly. The death of Jennifer Daugherty involved days of prolonged torture. Ms. Marinucci and her codefendants forced Jennifer to endure hours of

22

unimaginable terror and pain before she slowly bled to death on the floor of Ricky Smyrne's apartment. This was not a case which involved a few moments of youthful irresponsibility or indiscretion. The Defendant exhibited a level of callousness, over the course of Jennifer's torture and murder, which is seemingly incomprehensible. The Defendant has chosen not to take responsibility for her role in Jennifer's death in the courts. She has not hesitated, however, in using her actions during Jennifer's torture to bully other inmates and to instill fear. Her attempts to manipulate experts into believing that she is mentally unstable further reflect her lack of remorse. Based on all of the facts surrounding the Defendant's personal circumstances, and the nature of the crime committed, this Court believes that its sentence of life imprisonment without the possibility of parole is the most appropriate sentence as permitted by law.

## 2. WHETHER THE SENTENCE IMPOSED REPRESENTED AN ABUSE OF DISCRETION

Next, the Defendant asserts that "the argument set forth above with respect to the illegality of the sentence is incorporated herein to demonstrate that the sentence imposed was an abuse of discretion, as well." *Defendant's Brief in Support of Post-Sentence Motions*, pg. 4. Specifically, the Defendant alleges that this Court disregarded pieces of evidence which showed maturation and rehabilitation since Defendant's incarceration. It is well-established that:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Comm. v. Hoch*, 936 A.2d 515, 517-18 (Pa.Super. 2007).

23

The trial court is granted broad discretion in sentencing defendants "because of the perception that the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Comm. v. Mouzon*, 571 Pa. 419, 812 A.2d 617, 620 (Pa. 2002) (quoting *Comm. v. Ward*, 524 Pa. 48, 568 A.2d 1242, 1243 (1990)). Moreover, "an abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Comm. v. Walls*, 926 A.2d 957, 961 (Pa. 2007) (quoting *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038, 1046 (2003)). Where a presentence report exists, "we presume that the court was aware of relevant information regarding the defendant's character and weighed those considerations along with any mitigating factors." *Seagraves*, 103 A.3d at 842 (citing *Comm. v. Griffin*, 65 A.3d 932, 937 (Pa.Super.2013)).

The Superior Court found that a trial court did abuse its discretion in sentencing where it "failed to consider [the defendant's] age, family history, rehabilitative needs, the pre-sentence report or the fact that all of her offenses were non-violent in nature . . ." *Comm. v. Parlante*, 823 A.2d 927, 930 (Pa.Super. 2003) ("The trial court based [defendant's] sentence solely on the fact that her prior record indicated that it was likely that she would violate her probation in the future but failed to consider other important factors."). Conversely, it found that a trial court *did not* abuse its discretion where it considered a number of different factors in fashioning its sentence, including "appellee's conduct and demeanor when she entered her plea, the judge's knowledge of the related dependency case, evidence at the sentencing hearing, the applicable sentencing guidelines, and the pre-sentence report." *Comm. v. Hess*, 745 A.2d 29, 33 (Pa.Super. 2000). The court determined that while the trial court's sentence may have been

24

lenient, and "while some of its considerations were misguided," it did not constitute an abuse of discretion. *Id.* at 33.

Although the Defendant asserts that this Court disregarded numerous pieces of evidence, this Court made clear in its resentencing that it considered all evidence before it, including the extensive pre-sentence report. This Court questioned Doctor Wright on whether or not Defendant may have modeled cooperative behavior in prison to garner a more lenient sentence. *Id.* at 41. Such an inquiry was reasonable, however, in light of Doctor Wright's testimony that the Defendant's mental symptoms were inconsistent and potentially fabricated. Further, it was revealed upon cross-examination that Doctor Zerby, the Defendant's expert, had not reviewed the circumstances of the crime with the Defendant, and solely relied upon the Defendant's own retelling of her involvement in the crime in his evaluation. (RT 66). When asked why he did not further investigate the facts in detail, Doctor Zerby stated only that it was "because she did not want to go and talk about it in detail, and also she denied a significant role in the more serious offenses." (RT 67). Therefore, he was not aware of any trial testimony or statements which described the Defendant's level of involvement with Jennifer Daugherty's murder. (RT 67).

Both expert psychiatrists analyzed the Defendant under the factors established by *Miller* and *Batts*. The fact that this Court sentenced the Defendant to a term of life imprisonment does not mean that either of the reports was used in isolation, or that this Court chose to ignore Doctor Zerby's testimony. This Court employed its discretion in sentencing the Defendant within the range permitted by law, and with the aid of all reports and materials available. Thus, this Court's sentence was not an abuse of discretion.

3. **WHETHER THIS COURT ERRED IN DENYING DEFENDANT'S REQUEST FOR A SENTENCING JURY**

25

Defendant also asserts that "failing to have a jury determine important factual issues necessary for determining the appropriate sentence to be imposed under *Miller*, and *Batts*, [] runs afoul of the United States Constitution." *See Defendant's Brief in Support of Post-Sentence Motions*, pg. 5. While the Defendant concedes that there is no current law or rule of court in Pennsylvania to utilize such a sentencing court, she asserts that "the general trend of the United States Supreme Court jurisprudence suggests the necessity of using a jury to determine the appropriate sentence under the unique circumstances presented herein." *Id.*

In Pennsylvania, a jury may only be empanelled for sentencing under the authority of 42 Pa. C.S. §9711, which sets forth the sentencing procedures for charges of first degree murder. In such a case, the jury determines whether the defendant shall be sentenced to life imprisonment or the death penalty. Under *Roper*, juveniles cannot be sentenced to the death penalty; thus, 42 Pa. C.S. §9711 does not apply here.

Moreover, *Miller* is instructive in this instance, as its final paragraph suggests that either a judge or a jury can ultimately sentence a juvenile under the newly-established age-appropriate factors: The Court stated that "*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Miller,* 132 S.Ct. at 2475. *Miller did not* hold that a special procedure, involving the empanelling of a sentencing jury, was a constitutional necessity. Thus, this Court appropriately considered mitigating circumstances in sentencing the Defendant, in step with Pennsylvania law.

Although the Defendant cites to both *Apprendi* and *Alleyne* in support of her contentions, the Superior Court has recognized that these two cases, together with the Cruel and Unusual Punishment Clause, are meant to protect defendants "from the imposition of punishments by trial

26

judges that are *unconstitutional, imposed through unconstitutional processes,*" or represent *greater punishment than the legislature intended.* ***Comm. v. Lawrence***, 99 A.3d 116, 123 (Pa.Super. 2013) (emphasis added). None of those situations are present in this case, as this Court has not disobeyed any constitutional provision, nor is a term of life imprisonment a greater sentence than intended by the legislature. The Court in *Apprendi* also stated:

> We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion-taking into consideration various factors relating both to offense and offender-in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case.

*Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000).

And the *Alleyne* Court reiterated that "this ruling does not mean that any fact that influences judicial discretion must be found by a jury. This Court has long recognized that broad sentencing discretion, informed by judicial fact-finding, does not violate the Sixth Amendment." ***Alleyne v. United States***, 133 S.Ct. 2151, 2153 (2013). For these reasons, this Court was not in error when it denied Defendant's motion to empanel a jury for sentencing purposes.

4. **WHETHER SENTENCING A JUVENILE OFFENDER TO LIFE WITHOUT THE POSSIBILITY OF PAROLE IS PER SE UNCONSTITUTIONAL**

Last, Defendant asserts that "under the Eighth Amendment's prohibition against cruel and unusual punishment, coupled with the Appellate Courts' trend recognizing that juvenile offenders are fundamentally different . . . that any sentence of life without the possibility of parole" is per se unconstitutional. ***Defendant's Brief in Support of Post-Sentence Motions***, pg. 10. Defendant again concedes that there is no United States Supreme Court or Pennsylvania Supreme Court precedent to support such notion.

27

The Supreme Court in *Graham* distinguished homicide from all other crimes, stating that "there is a line 'between homicide and other serious violent offenses against the individual.'" *Graham v. Florida*, 560 U.S. 48, 69 (2010) (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 437-38 (2008)). Although other serious crimes certainly exist, "those crimes differ from homicide crimes in a moral sense." *Id.* Thus, the Court only held that life sentences for juveniles convicted of non-homicide offenses unconstitutional. *Id.* at 70-71. The *Miller* Court mandated only that "a sentence follow a process-considering an offender's youth and attendant circumstances-before imposing a particular penalty." *Miller*, 132 S.Ct. at 2471. Thus, there is no court precedent for the notion that life sentences for juveniles run afoul of either the Pennsylvania or U.S. Constitution.

While the United States Supreme court has certainly acknowledged that juveniles require different sentencing procedures under the law, such protections have not rendered life sentences invalid. This Court recognized those protections, and considered age-appropriate factors in its resentencing of Defendant. However, under Pennsylvania law and United States Supreme Court precedent, there is no support for the proposition that all life sentences without the possibility of parole for juveniles are *per se* unconstitutional.

28

## CONCLUSION:

For the foregoing reasons of fact and of law, the Defendant's Post-Sentence Motions are hereby **DENIED.**

**BY THE COURT:**

October 28, 2015

Date

Rita Donovan Hathaway, Judge

ATTEST:

_____

Clerk of Courts

c.c.    File
       John W. Peck, Esq., District Attorney
       Leo Ciaramitaro, Esq., Assistant District Attorney
       Michael DeMatt, Esq., Counsel for the Defendant
       Pam Neiderhiser, Esq., Court Administrator's Office